Filed 2/20/26  P. v. Utsey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ELIJAH UTSEY et al.,<br><br>        Defendants and Appellants. | C100535<br><br>(Super. Ct. No. 22FE019386) |

Defendants Elijah Utsey and Joshua Emmanuel Berry were found guilty of first degree murder with the enhancement of using a firearm causing death.  Defendants make several arguments on appeal:  (1) Berry challenges the admission of Utsey's police interrogation on confrontation grounds; (2) both defendants assert several claims of

1

instructional error; and (3) both defendants challenge the trial court declining to strike their firearm enhancements under Penal Code[1] section 1385. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Defendants were charged with murder with the enhancement they personally discharged a firearm causing death. It was also alleged that Utsey had a prior felony strike conviction.

At trial, evidence showed Terrence Hanes was discovered dead on July 4, 2022, from multiple gunshot wounds. Officers recovered five .40-caliber casings and twelve 9-millimeter casings at the scene; there was no firearm near Hanes's body.

Law enforcement officers downloaded the contents of Hanes's phone and found multiple social media messages between Hanes and Utsey. The content of the messages overall indicated a "big brother, little brother type of relationship," but the two would also "squabble frequently." Utsey and Hanes had a "heated argument" on July 1, 2022, and that afternoon Utsey posted a picture of him in a mask with the words "I'll leave your body slumped"; there was a screenshot of this post on Hanes's phone. Later that day, Hanes sent Utsey a message insulting Utsey's family, saying: " 'Bitch, cut it out. Yo whole family broke and bummy . . . . Look at how all y'all ended up . . . . Let's be real, three living off of government assistance, one living in a trailer park, and the other one dead. Make it make sense, bro.' "

The search of Hanes's phone also showed a connection between Utsey and Berry. As a result, officers investigated Berry's social media accounts and found he owned a red car consistent with a car seen in Hanes's neighborhood around the time of Hanes's murder.

---

[1] Further undesignated section references are to the Penal Code.

After more investigation, it was discovered Berry's red car incurred a toll on the Carquinez Bridge at 8:44 p.m. on July 1, 2022. The video surveillance in Hanes's neighborhood showed a matching red car enter Hanes's neighborhood in Sacramento at 9:53 p.m. July 1, 2022, leave, and then come back at 10:13 p.m. These videos then show two people leave the car at 10:20 p.m., gunshots at 10:25 p.m., and then two people run away from the direction of Hanes's house before the car leaves the area.

Law enforcement officers recovered cell phone location data for Utsey's and Berry's phones. Defendants' phones' location data match that of the red car throughout the evening of July 1, 2022, starting in Oakland, going over the Carquinez Bridge at the same time Berry's car incurred the toll, and to Hanes's house in Sacramento. The precision of Utsey's phone's data showed the phone leaving the area of the parked red car and moving toward Hanes's house between 10:20 and 10:28 p.m. And Berry's phone placed a call at 10:17 p.m. from outside of Hanes's house. After the car left the scene, both phones traveled to an area where Utsey's sister lives.

The jury found both defendants guilty of first degree murder and found true the personal use of a firearm allegation.

At sentencing, the trial court found true beyond a reasonable doubt Utsey had been previously convicted of a strike offense for residential burglary. The court then denied Utsey's request to strike that strike and denied both defendants' requests under section 1385 to strike the firearm enhancements. The trial court then sentenced Berry to 25 years to life for the murder and a consecutive 25 years to life for the firearm enhancement, for a total term of 50 years to life. The trial court sentenced Utsey to the same term except the murder sentence was doubled for his prior strike, for a total term of 75 years to life.

Defendants appeal.

DISCUSSION

I

*The Admission Of Utsey's Interrogation*

*Did Not Violate Berry's Confrontation Rights*

Berry first challenges the trial court admitting a video of law enforcement officers interrogating Utsey after his arrest. Citing *Bruton v. United States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518, Berry argues he was deprived of his constitutional right to cross-examine Utsey when Utsey's "testimonial statement to the police was played for the jury" and Utsey did not testify at trial. (Capitalization and boldface omitted.) The People contend there was no error because "none of Utsey's statements constituted a confession, much less one that was facially incriminating to Berry." We agree with the People.

A

*Additional Background*

After Utsey's arrest, law enforcement officers interviewed him. Video of this interview was played for the jury during the testimony of one of the interviewing officers, who was the prosecution's final witness. During the interrogation, officers presented Utsey with messages of him arguing with Hanes online, the phone data showing him at Hanes's house when Hanes was killed, and a recording of the gunshots.

The interviewing officers also asserted several times Utsey knew someone else was involved, this person "drives a red car, that [Utsey was] also in that night," and stated: "[W]e're gonna be talkin' to him right afterwards. And I don't want you, who was so close to [Hanes], to be silent on somethin' like this, when your buddy, who was there, might throw you under the bus." The officers also showed Utsey pictures of Berry, including one with his red car, and asked if he knew him or recognized the car. Utsey originally said he did not recognize Berry but then said, "[Berry] look[s] familiar. I

4

probably seen him around before," and "[t]hat's probably where I seen him before – on Instagram." These pictures were shown to the jury.

Utsey maintained throughout the interview he did not know what happened the night of July 1, 2022, he "probably could have been in Sacramento" that night but "[m]ost likely" was visiting his sister, he was not involved with Hanes's death, and towards the end of the interview stated: "I'm innocent – I'm innocent . . . – that doesn't mean nothin[g] to y'all."

The video, and the provided transcript, had several redacted sections. Prior to trial, the parties discussed admitting Utsey's interview. Berry's counsel objected to any references to Berry, arguing the jury could infer a connection between the two defendants and violate Berry's confrontation rights because Berry's counsel would not have the opportunity to cross-examine Utsey. The parties and the trial court went through the video and transcript to eliminate any references to Berry. They also eliminated references to Utsey having been in prison before and possessing a gun. But the court permitted the officers' references to a second suspect and the officers showing Utsey pictures of Berry, as described in the paragraph above.

B

*Legal Standards*

"The *Aranda*/*Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. ' "*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' " ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1176.) The rule applies only to a "facially incriminating confession of a nontestifying codefendant" that

5

" 'expressly implicat[ed]' the defendant as his[, her, or their] accomplice."
(*Richardson v. Marsh* (1987) 481 U.S. 200, 207-208.)

C

*Utsey's Statements Did Not Trigger The* Aranda/Bruton *Rule*

Berry's arguments focus on the insufficiency of the redactions, asserting the trial court's redactions "failed to consider the entire context of the interview" because "[w]ithout any reference to any other evidence, it would have been obvious to the jury that all of these references were to . . . Berry. Simply removing . . . Berry's name, as the trial court believed, was not enough to sanitize the interrogation." But this argument ignores the threshold question of whether Utsey made statements incriminating Berry at all. We conclude he did not.

Utsey routinely and consistently denied any involvement with Hanes's killing, including being at Hanes's house on July 1, 2022, and explicitly asserted his innocence. Utsey also said Berry only looked familiar, possibly from Instagram, without any indication they had a relationship that could involve jointly killing Hanes. There are therefore no incriminating statements triggering the *Aranda/Bruton* rule.

The statements that Berry alleges were incriminating are attributable to the *officers*, not Utsey. This includes the "repeated references to the fact that . . . Utsey was not alone . . . when he traveled from Oakland to Sacramento" and "the detective showing . . . Utsey a picture of . . . Berry." None of this can be attributed to Utsey, and Berry provides no legal support establishing law enforcement questions during an interrogation implicate the *Aranda/Bruton* rule, which is applied only to a codefendant's statements.

In his reply, Berry contends Utsey made "adoptive admissions" of the officers' statements, including by not denying the possibility he was in Sacramento the day of the murder. Even if Utsey denied killing Hanes, Berry argues this statement incriminates Berry. We disagree and conclude these statements are not sufficient because "[t]he class of inferentially incriminating statements under *Bruton* is limited to 'obvious[]' ones,

6

'inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.' " (*People v. Montes* (2014) 58 Cal.4th 809, 867.) That is not the case with Utsey's repeated denials of killing Hanes, even if he implied a possibility of being in Sacramento the day of the murder. Thus, we conclude there was no error because Utsey's statements were not confessions incriminating Berry. (See *People v. Homick* (2012) 55 Cal.4th 816, 875 [finding *Aranda/Bruton* did not apply because a codefendant's statement "was not a confession, much less one that facially incriminated [the] defendant"].)

II

*Defendants Do Not Establish Any Reversible Jury Instruction Error*

Defendants make several challenges to the jury's instructions. We reject each challenge in turn.

A

*Jury Instruction Legal Standards*

Trial courts have a duty to sua sponte instruct " 'on those general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case.' " (*People v. Simon* (2016) 1 Cal.5th 98, 143.) On appeal, we review " 'the wording of a jury instruction de novo' " and "determine[] whether 'the instructions are complete and correctly state the law.' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.) We examine the entire charge of the court to determine whether the instructions are adequate (*People v. Pena* (1984) 151 Cal.App.3d 462, 475) and whether it is reasonably likely that the instructions as a whole caused the jury to misapply the law (*People v. Cain* (1995) 10 Cal.4th 1, 36).

Failure to object to a jury instruction affecting the substantial rights of the defendant does not result in a forfeiture of the right to appellate review of the instruction. (§ 1259; *People v. Cabral* (2004) 121 Cal.App.4th 748, 750.) "The doctrine of invited error[, however,] applies to estop a party from asserting an error when 'his[, her, or their]

7

own conduct induces the commission of error.' " (*People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3, italics omitted.)  But in the absence of a clear and deliberate tactical purpose by counsel in suggesting or acceding to an erroneous instruction, courts and commentators shun a finding of invited error that excuses a trial judge from rendering full and correct instructions on material questions of law.  (*People v. Moon* (2005) 37 Cal.4th 1, 28; *People v. Boyette* (2002) 29 Cal.4th 381, 438; *People v. Graham* (1969) 71 Cal.2d 303, 319.)  That is, "only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction [will it] nullify the trial court's obligation to instruct in the cause." (*Graham*, at p. 319.)

B

*Additional Background*

After the close of evidence, the parties and the trial court discussed jury instructions, including CALCRIM Nos. 224 and 225.  The court stated:  "I almost always let the lawyers decide this issue.  [CALCRIM Nos. ]224 and 225 on circumstantial evidence, the [c]ourt can give either, but I can only give one.  Some lawyers like the way [CALCRIM No. ]224 reads better.  And more specifically, defense attorneys sometimes have options.  If you guys care, we can give [CALCRIM No. ]224 or we can give [CALCRIM No. ]225."  Utsey's attorney stated:  "I've gotten some judges to give a hybrid in this courthouse.  You've denied that request before.  So based on the facts of this case, I would choose [CALCRIM No. ]225 over [CALCRIM No. ]224."  The court asked Berry's counsel, who said, "That's fine," so the court gave CALCRIM No. 225 and not CALCRIM No. 224.

The CALCRIM No. 225 instruction given explained the prosecution must prove a defendant's mental state and provided:  "[Intent] may be proved by circumstantial evidence.  [¶]  Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the [prosecution] ha[s] proved each fact essential to that conclusion beyond a reasonable

8

doubt." The instruction further stated if there are two or more reasonable conclusions of intent that could be drawn from the circumstantial evidence, "you must conclude that the intent and/or mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." CALCRIM No. 224 applies this same instruction broadly whenever circumstantial evidence is used to prove any "fact necessary to find the defendant guilty," not just mental state.

During jury instruction discussions, the trial court also asked if "anybody th[ought] [CALCRIM Nos. ]334 or 335 should be given?" These instructions detail how a jury must handle incriminating statements by an accomplice. (See CALCRIM Nos. 334, 335.) All attorneys said no, and the court did not give either instruction.

The trial court did instruct the jury with CALCRIM No. 359, stating a defendant cannot be convicted based solely on out-of-court statements and can only rely on these statements if there is other evidence a crime was committed. The instruction further stated: "This requirement of other evidence does not apply to proving the identity of the person who committed the crime . . . . If other evidence shows that the charged crime . . . was committed, the identity of the person who committed it . . . may be proved by the defendant's statements alone. [¶] You may not convict the defendant unless the [prosecution] ha[s] proved his guilt beyond a reasonable doubt."

In addition to the CALCRIM Nos. 225 and 359 instructions, the trial court provided other instructions discussing the burden of proof. The court gave the standard CALCRIM No. 220 explaining the presumption of innocence and that this "presumption requires that the [prosecution] prove a defendant guilty beyond a reasonable doubt." The court continued, "Whenever I tell you the [prosecution] must prove something, I mean [it] must prove it beyond a reasonable doubt unless I specifically tell you otherwise." The court also gave the CALCRIM No. 223 instruction explaining direct and circumstantial evidence and that the jury "must decide whether a fact in issue has been

9

proved based on all the evidence." CALCRIM No. 355 stated a defendant does not need to testify and instead may "rely on the state of the evidence and argue that the [prosecution] ha[s] failed to prove the charges beyond a reasonable doubt." CALCRIM Nos. 520, 521, and 640 also mentioned the need to establish first degree murder beyond a reasonable doubt. And CALCRIM No. 3149 stated the prosecution had to prove the firearm allegation beyond a reasonable doubt. Finally, CALCRIM No. 200 was given, which told the jury, among other things, to "[p]ay careful attention to all of these instructions and consider them together."

## C

### *There Was No Reversible Error By Not Giving CALCRIM No. 224*

Berry asserts the trial court committed reversible error by not instructing the jury with CALCRIM No. 224. Berry argues there were two reasonable inferences from the circumstantial evidence, therefore "[t]he court had a sua sponte duty to instruct the jury that it must accept the reasonable inference that points toward innocence." The People argue forfeiture, the instruction does not apply, and any error was harmless. We agree with the People's final contention.

Initially, we conclude this issue was not forfeited because there was no evidence that requesting CALCRIM No. 225 over CALCRIM No. 224 had a deliberate tactical purpose. Instead, it appears Utsey's attorney wanted to give a hybrid of both instructions, but the trial court had a history of allowing only one and the court did not discourage this understanding. We will therefore discuss the issue on the merits.

The difference between the CALCRIM No. 224 instruction not given and the given CALCRIM No. 225 instruction is that CALCRIM No. 224 states the jury must believe a reasonable inference of innocence from circumstantial evidence on all facts, not just intent. " 'CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive. [Citation.]' [Citation.] CALCRIM No. 224 'is the proper instruction to give

10

unless the only element of the offense that rests substantially or entirely on circumstantial evidence is that of specific intent or mental state.' " (*People v. Contreras* (2010) 184 Cal.App.4th 587, 592.) Courts have said an instruction on the principles contained in CALCRIM No. 224 " 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 885 [analyzing the comparable instruction CALJIC No. 2.01].) But our Supreme Court has also indicated CALCRIM No. 224 "should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence." (*People v. Heishman* (1988) 45 Cal.3d 147, 167 [analyzing the comparable instruction CALJIC No. 2.01], abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

The People argue, "[U]nder *Heishman*, the trial court had no duty to instruct the jury with CALCRIM No. 224" because "[o]nly one reasonable conclusion can be drawn from this evidence, that is, Berry drove Utsey to Sacramento and, together with Utsey, shot Hanes multiple times as he lay on his couch." We do not need to address whether *Heishman* relieved trial courts of their duty to instruct with CALCRIM No. 224 under circumstances presented by this case because we conclude any error was harmless.

The harmless error analysis here requires us to examine whether there is a reasonable probability a properly instructed jury would have returned a verdict more favorable to defendants had the trial court used CALCRIM No. 224. (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 886-887.) " ' " ' "[A] 'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." ' " ' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 422, italics omitted.) " 'In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no

11

reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956, italics omitted.)

Identity was the main issue in the case, and whether Berry and Utsey were the two figures leaving the car and shooting Hanes. The CALCRIM No. 225 instruction applied only to inferences of intent from circumstantial evidence, unlike CALCRIM No. 224 which would have applied to every fact, including identity. We therefore must analyze specifically the strength of the identity evidence and whether there was a reasonable probability the jury could have found a reasonable inference Berry was not one of the shooters.[2]

We conclude any error here was harmless given the overwhelming evidence of Berry's identity as one of the killers. Berry's phone went from Oakland to Hanes's house the day of the killing and was at Hanes's house at the time of the gunshots. Berry's car matched the description of the suspects' red car, in color and other physical features, and the toll confirmed Berry's car was in the same location of the suspects' car at the same time. Videos showed the occupants of the car get out and walk towards the house right before gunshots are heard, and the car left the neighborhood after the shots. Berry's phone also made a call outside of Hanes's house before the shooting. And there was no evidence any person other than Utsey and Berry possessed their phones or possessed Berry's car on July 1, 2022. Based on this evidence there is no reasonable probability the jury would have returned a different result had the trial court given the more inclusive CALCRIM No. 224 instruction.

---

[2] Utsey joined Berry's argument on this issue. But he does not present any individualized argument and we will therefore only analyze the evidence from the perspective of Berry. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["Appellate counsel for the party purporting to join some or all of the claims raised by another [is] obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her [or their] client's ability to seek relief on that ground"].)

Berry's argument does not present an inference of innocence the jury was reasonably likely to adopt. Berry contends there were two reasonable inferences from the evidence: (1) The prosecutor's inference Berry and Utsey drove to Sacramento and killed Hanes and (2) "that . . . Berry, who had no known connection to, or conflict with, . . . Hanes, simply loaned his car to . . . Utsey. Both inferences are reasonable." But Berry's inference does not acknowledge, much less incorporate and explain, the presence of his phone or the call made from outside Hanes's house, making Berry's proposed inference clearly unreasonable when compared to the evidence overwhelmingly supporting the inference he was a participant in Hanes's murder.

We therefore conclude any error in not instructing on CALCRIM No. 224 was harmless.

D

*There Was No Error By Not Giving CALCRIM No. 334*

Berry next argues the trial court prejudicially erred in not instructing the jury with CALCRIM No. 334. Berry asserts, "[T]he trial court failed to instruct the jury that it must find that . . . Utsey's accomplice statement was corroborated." The People argue forfeiture, no error, and no prejudice. We again first conclude there was no forfeiture given the lack of evidence it was a tactical decision by defense counsel not to request CALCRIM No. 334 when the trial court asked whether either attorney wanted it included. (*People v. Graham*, *supra*, 71 Cal.2d at p. 319 ["only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction [will it] nullify the trial court's obligation to instruct in the cause"].) But addressing the merits, we do conclude there was no error here.

CALCRIM No. 334 instructs the jury: "You may use (a statement/[or] testimony) of an accomplice that tends to incriminate the defendant to convict the defendant only if" it is corroborated with evidence independent of the statement and this evidence tends to connect the defendant with the commission of the crime.

13

As discussed, Utsey made no incriminating statement to make this instruction relevant. The plain language of the instruction applies only to a statement tending to incriminate the defendant. (Cf. *People v. Alvarez* (1996) 14 Cal.4th 155, 218 [explaining the instruction was proper in that case because "the accomplice-defendant's testimony should be viewed with distrust *to the extent that it tends to incriminate his*[*, her, or their*] *codefendant*"].) As previously discussed with the *Aranda*/*Bruton* rule, Utsey's statements were only denials. Berry does not establish Utsey's denials incriminate him. We therefore conclude there was no error in not giving CALCRIM No. 334.

E

*There Was No Error With The Language Of CALCRIM No. 359*

Utsey next argues the trial court's given CALCRIM No. 359 instruction was prejudicially erroneous. Utsey asserts the CALCRIM No. 359 instruction told the jury it could find identity based on a defendant's statements alone but "these 'statements alone' were insufficient to prove beyond a reasonable doubt that . . . Utsey committed the crime, telling jurors they could rely on those statements alone to infer identity undercut the state's burden of proof." Utsey argues this requires "per se reversal" and even if it is not per se reversible, it was prejudicial error because it went to the single contested issue of identity. The People argue forfeiture, no error, and no prejudice. We conclude there was no error.

CALCRIM No. 359 is based on the corpus delicti rule. " 'In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.' " (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 829.) "The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements." (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) "The independent proof [of the corpus delicti] may be circumstantial and need not be beyond a reasonable doubt." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1171.) "In every case, once the necessary

14

quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Ibid*.) However, the "identity of the defendant as the perpetrator is not part of the corpus delicti; identity may be established by the defendant's words alone." (*People v. Valencia* (2008) 43 Cal.4th 268, 297.)

There was previously a split on whether CALCRIM No. 359 was erroneous. The court in *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1427-1428, concluded "that CALCRIM No. 359 is deficient to the extent it lends itself to an interpretation that criminal defendants could be convicted on the basis of extrajudicial statements alone that they committed a crime." Whereas the court in *People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258-1259, "disagree[d] with *Rivas* and f[ound] no instructional error." But, as explained in the CALCRIM No. 359 bench notes, "[t]he instruction has been modified in light of the discussion in *Rivas*." (Judicial Council of Cal., Crim. Jury Instns. (2018 ed.) Bench Notes to CALCRIM No. 359, p. 126.)

The former version of CALCRIM No. 359 analyzed in *Rivas* and *Rosales* stated in relation to identity: " 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' " (*People v. Rivas*, *supra*, 214 Cal.App.4th at p. 1428, fn. 5, quoting former CALCRIM No. 359.) The updated CALCRIM No. 359 instruction given here more clearly and thoroughly explained the relevant law. It explained that the "requirement of other evidence does not apply to proving the identity of the person who committed the crime." It further reiterated that only if other evidence proved the commission of the crime may the jury assess whether the defendant's statements proved identity: "If other evidence shows that the charged crime . . . was committed, the identity of the person who committed it . . . may be proved by the defendant's statements alone." This correctly states the corpus delicti rule. (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 721 ["The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own

15

statements"].) And the court has a mandatory duty to instruct on the corpus delicti rule "[w]henever an accused's extrajudicial statements form part of the prosecution's evidence." (*People v. Alvarez, supra*, 27 Cal.4th at p. 1170.) We therefore conclude there was no error in the language of the CALCRIM No. 359 instruction given here.

F

*There Was No Burden Of Proof Instructional Error*

Utsey also asserts the CALCRIM No. 359 instruction allowed the jury to convict him on proof less than beyond a reasonable doubt because his statements were not sufficient to establish identity beyond a reasonable doubt. Similarly, Utsey contends the CALCRIM No. 225 instruction given violated his constitutional rights because it instructed the jurors proof beyond a reasonable doubt applied only to circumstantial evidence. Utsey explains the CALCRIM No. 225 instruction correctly advised circumstantial evidence beyond a reasonable doubt, but the instruction did not include direct evidence. From this he asserts: "[I]t is both obvious, and logical, that by explicitly limiting this principle to *circumstantial* evidence, the instruction logically told the jurors that this principle did *not* apply to direct evidence. Put another way, if this cautionary principle applied both to direct and circumstantial evidence, the instruction would not have referenced only circumstantial evidence." Berry joins this argument. The People contend forfeiture, no error, and no prejudice. We conclude there was no error here.

Defendants' narrow arguments on CALCRIM Nos. 359 and 225 ignore the totality of the instructions given referencing the burden of proof. There were six instructions other than CALCRIM Nos. 359 and 225 that told the jury it had to find a certain fact true beyond a reasonable doubt. This includes the standard burden instruction CALCRIM No. 220 explaining the presumption of innocence and that this "presumption requires that the [prosecution] prove a defendant guilty beyond a reasonable doubt." The trial court continued, "Whenever I tell you the [prosecution] must prove something, I mean [it] must prove it beyond a reasonable doubt unless I specifically tell you otherwise." CALCRIM

16

Nos. 355, 520, 521, 640, and 3149 affirmed specific facts must be found true beyond a reasonable doubt. The CALCRIM No. 223 instruction also instructed on circumstantial and direct evidence, concluding: "You must decide whether a fact in issue has been proved based on *all the evidence*." (Italics added.) There were no instructions stating there was a lower burden of proof applicable on any fact, and the jury was instructed to consider all instructions together.

This is why the case defendants rely upon, *People v. Vann* (1974) 12 Cal.3d 220, is inapplicable. There, our Supreme Court found reversible error where the trial court did not give the standard reasonable doubt instruction, now CALCRIM No. 220. (*Vann*, at pp. 222-223, 225.) The trial court there did give the CALCRIM No. 225 equivalent, but our Supreme Court found this insufficient by itself because the instruction "might with equal logic have been interpreted by the jurors as importing the need of a lesser degree of proof where the evidence is direct and thus of a higher quality." (*Vann*, at pp. 226-227.)

Unlike *Vann*, the trial court here gave the standard reasonable doubt instruction, along with several others establishing beyond a reasonable doubt as the appropriate standard without any implication direct evidence is susceptible to a lower burden. Had the jury been confused on whether CALCRIM No. 225 was implicitly stating direct evidence could be applied with a lower than beyond reasonable doubt standard, or that CALCRIM No. 359 permitted finding identity under a lesser standard, there is no reasonable chance it held this mistaken belief when considering the totality of the instructions as it was told to do. (See *People v. Solomon* (2010) 49 Cal.4th 792, 826 [finding the standard burden of proof instruction, "coupled with the directive to 'consider the instructions as a whole and each in light of the others,' fully apprised the jury that the reasonable doubt standard applied to both forms of proof"].) We consequently conclude it was not reasonably likely the jury misapplied these instructions on the whole to convict with a lower burden.

17

## III

### *The Trial Court Did Not Abuse Its Discretion Under Section 1385*

The defendants finally assert the trial court abused its discretion when declining to strike their firearm enhancements under section 1385.  We conclude there was no abuse of discretion.

### A

### *Additional Background*

For its analysis under section 1385, the trial court first assumed the mitigating circumstances the defendants asserted under section 1385 applied.  The trial court then noted aggravating factors listed in the probation report:  "Obviously, this is a crime that involved death.  This is a crime that involved great harm.  It was vicious.  It was callous.  The defendants, obviously, were armed, although that's part of the potential enhancement; so I don't consider it for that purpose.  The manner in which the crime was carried out definitely indicated planning."  The court then summarized the facts of the killing concluding:  "[D]efendants walk[ed] into that back room and execut[ed] . . . Hanes.  [¶]  . . .  So it would appear that this was a very cold, cold, calculated murder that was carried out.  [¶]  So these are [*sic*] violent conduct that indicates a serious danger to society."  Berry was also on probation and Utsey was on parole at the time of the crime.  Thus, the court found, "[T]here are a lot of aggravating circumstances in this case."

The trial court then balanced the factors:  "So I do balance that against all the mitigating circumstances in this case, and I am giving them the mitigating circumstances, for both defendants in here, great weight when I consider this. . . .  I find the aggravating circumstances do outweigh the mitigating circumstances in this case, and argue against or point the [c]ourt against striking the firearm enhancement.  [¶] . . .  [E]ven if a reviewing court looked at this and thinks that the [c]ourt is incorrect on this analysis, I would say that even then I would not strike these firearm enhancements because I do think that it would endanger -- to dismiss these enhancements would endanger public safety, as

indicated in [section] 1385[, subdivision ](c)(2), and that the likelihood of dismissal would very well result in physical injury or danger to others.  I think a maximum sentence in this case is appropriate."  Thus, the court concluded:  "[W]hen I balance all that out, I'm going to decline to strike the enhancement -- the firearm enhancement in this case."

B

*Legal Standards*

Section 1385, subdivision (c)(1) states in relevant part:  "[T]he court shall dismiss an enhancement if it is in the furtherance of justice to do so."  "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances" listed in the statute "are present."  (§ 1385, subd. (c)(2).)  Presence of any of "these [mitigating] circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (*Ibid*.)

As our Supreme Court has explained, "section 1385, subdivision (c)(2)'s mandate to give 'great weight' to enumerated mitigating circumstances requires a sentencing court to 'engage[] in a holistic balancing with *special emphasis* on the enumerated mitigating factors.' "  (*People v. Walker* (2024) 16 Cal.5th 1024, 1034-1035, citing with approval *People v. Ortiz* (2023) 87 Cal.App.5th 1087.)  "Stated simply, if the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement.  But ultimately, the court must determine whether dismissal is in furtherance of justice.  This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' "  (*Walker*, at p. 1036.)

19

C

*The Trial Court's Public Danger Analysis*

*Did Not Result In An Abuse Of Discretion*

Utsey argues the trial court abused its discretion by focusing exclusively on his current dangerousness for the public endangerment analysis, instead of when he could be released if the enhancement was stricken, which is still 50 years in the future and subject to Board of Parole Hearings approval. Berry joins in the argument.

Defendants' argument ignores the entirety of the section 1385, subdivision (c) analysis. The public dangerousness analysis is a release valve on section 1385's great weight analysis in subdivision (c)(2). Section 1385 requires courts to weigh greatly mitigating factors "unless" dismissal would ultimately endanger public safety. (§ 1385, subd. (c)(2).) But the statute does not mandate the public safety analysis in every instance, only as a means to circumvent the great weight analysis. A necessary corollary is that courts can do the furtherance of justice analysis greatly weighing the mitigating factors irrespective of the public safety analysis.

This is why Utsey's primary reliance on *People v. Gonzalez* (2024) 103 Cal.App.5th 215 is misplaced. The appellate court there found an abuse of discretion where the trial court's public danger analysis concluded the defendant " 'presently' " represented a danger. (*Id*. at pp. 224, 230-231.) The appellate court found this analysis erroneous because the plain language of section 1385, subdivision (c)(2) does not support a "singular focus on whether the defendant *currently* poses a danger." (*Gonzalez*, at p. 228.) Instead, "the trial court must look to when a defendant would be released" and determine if that defendant could still pose a danger to society in the future. (*Id*. at p. 229.)

However, the issue in *Gonzalez* was not the great weight analysis. The trial court's analysis made no mention of the mitigating factors and their weight. (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at pp. 223-224.) Instead, the trial court's section 1385

20

analysis sought to answer one question: Did the trial court "consider [the defendant] to be a danger to society?" (*Gonzalez*, at p. 223.) The appellate court's opinion therefore focuses exclusively on the public endangerment analysis. (See *id*. at p. 224 [summarizing the issues].) Thus, the appropriateness of the public danger analysis was critical to whether the trial court abused its discretion under section 1385.

Conversely, the trial court here assumed the mitigating factors were present and stated: "I am giving them the mitigating circumstances, for both defendants in here, great weight when I consider this." The court still declined to exercise its discretion because it found several serious aggravating factors outweighed the great weight of the mitigating factors. Defendants do not challenge this analysis, so we consequently do not analyze its sufficiency. The trial court did also find dismissal of the enhancements would endanger public safety. But even were we to agree with defendants that this analysis was deficient, this would not require reversal because the trial court already performed the overarching great weight analysis. Thus, defendants' focus on the public endangerment analysis does not undermine the trial court's decision not to strike the firearm enhancements. We therefore affirm the trial court declining to strike defendants' firearm enhancements.

## DISPOSITION

The judgment is affirmed.

/s/
ROBIE, Acting P. J.

We concur:

/s/
DUARTE, J.

/s/
KRAUSE, J.

22